IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TYLER DAGON, Administrator of the Estate of Timothy Dagon, Deceased, Plaintiff, <br><br> v. <br><br> BNSF RAILWAY COMPANY and UNITED STATES STEEL CORPORATION, Defendants. | Case No. 19–CV–00417–JPG |

## **MEMORANDUM & ORDER**

This is a personal-injury case arising from the death of Timothy Dagon ("decedent"). Plaintiff Tyler Dagon ("Estate") moved to remand. Defendants BNSF Railway Company ("BNSF") and United States Steel Corporation ("U.S. Steel") responded. For the reasons below, the Court**:**

- **GRANTS** the Estate's Motion to Strike;

- **DENIES** the Estate's Motion to Remand;

- **DISMISSES** Counts One and Four of the Complaint;

- **FINDS AS MOOT** U.S. Steel's Motion to Dismiss Count Four; and

- **FINDS AS MOOT** BNSF's Motion for Summary Judgment on Count One.

### I.    PROCEDURAL & FACTUAL HISTORY

**A.  U.S. Steel, BNSF & Terminal Railroad**

U.S. Steel is a steel producer with a facility in Granite City, Illinois. (Compl. 3, ECF No. 1-2). The facility contains internal rail lines; and U.S. Steel operates its own locomotives to load railcars with coke, weigh them, and prepare them to be hauled to other facilities. (Gum Dep. 8:10–22, 13:5–13, ECF No. 67-1). It is not, however, "a regulated railroad" and therefore cannot

conduct railroad operations. (Bojalad Dep. 26:11–16, ECF No. 49-7). Instead, U.S. Steel hires regulated railroads to haul its freight between facilities. (*Id.* at 12:15–13:9).

Which railroad U.S. Steel hires "depends on where they need the products shipped and who is the most competitive shipper at the time." (*Id.* at 29:10–12). BNSF, the Canadian National Railway, Union Pacific Railroad, CSX Transportation, Kansas City Southern Railway—U.S. Steel "use[s] all of them to a pretty big extent." (*Id.* at 28:22–29:7). Rates may vary depending on whether the railroad can provide its own railcars or must lease them for the job. (*Id.* at 15:24–16:5).

Because the railroads do not service the Granite City facility directly, U.S. Steel contracted with the Terminal Railroad Association of St. Louis ("Terminal Railroad") to provide a "switching service" that connects larger carriers with smaller ones. (*Id.* at 11:4–8, 22:8–23:2). For example, U.S. Steel wanted to haul coke from Granite City to its facility in Gary, Indiana. (*Id.* at 28:1–3). So it solicited rates and ultimately hired BNSF for the job. (*Id.* at 28:16). U.S. Steel prepared the BNSF-owned railcars and transferred them to Terminal Railroad; Terminal Railroad transferred them to BNSF; and BNSF transferred them to the Gary facility. (*See id.* at 28:13–16, 29:16–30:3).

### B. TranStar

TranStar has been a wholly owned subsidiary of U.S. Steel for nearly one hundred years. (*Id.* at 7:1–6). It manages U.S. Steel's "five common carrier railroads, two switching companies, and also handles certain functions of their movement services role for logistics and raw materials." (*Id.*).

### C. The Decedent

The decedent was a switchman for U.S. Steel at its Granite City facility.[1] (Compl. 3). One day, he worked with a locomotive operator to weigh a BNSF-owned railcar and move it around the railyard. (*Id.*). But after moving the locomotive forward, the operator "heard an inaudible transmission on his two way radio." (*Id.*). When he heard a second transmission that sounded like a cry for help, the operator "stopped the locomotive, exited the train, and observed Dagon laying on the ground with an obvious left leg injury." (*Id.* at 4). A video supplied by U.S. Steel to the Granite City Police Department depicted the decedent "riding on the side of the train who appeared to fall or jump down from the train and go underneath the railcar." (*Id.*). The BNSF-owned railcar severed his leg; and he died four hours later at St. Louis University Medical Center. (*Id.* at 4–5).

### D. Litigation

The Estate—the decedent's only child—sued U.S. Steel and BNSF in Illinois' Third Judicial Circuit Court. (*Id.* at 1–2). Along with common-law negligence claims against BNSF (Counts Two and Three), the Estate alleges that U.S. Steel and BNSF are liable for the decedent's death under the Federal Employers' Liability Act ("FELA") (Counts One and Four). (*Id.* at 1–8, 10–17).

U.S. Steel and BNSF removed the case to this Court based on diversity of citizenship: The Estate is an Illinois citizen; U.S. Steel is a Pennsylvania citizen; and BNSF is a Texas citizen. (Notice of Removal 2, ECF No. 1). And although cases arising under FELA are generally not removable, *see* 28 U.S.C. § 1445(a), U.S. Steel and BNSF contend that the Estate *fraudulently joined* the FELA claims to defeat federal jurisdiction, (Notice of Removal 4–9). In short, U.S. Steel argues that it is not a common-carrier railroad; and BNSF argues that it was not the decedent's

---

[1] Switchmen "separate freight cars which are currently coupled together and reassemble them with other cars having common destinations." *DeBiasio v. Ill. Cent. R.R.*, 52 F.3d 678, 679 (7th Cir. 1995).

employer. (*Id.*). Because FELA only holds liable employers that are common-carrier railroads, U.S. Steel and BNSF ask the Court to dismiss the Estate's FELA claims as frivolous and allow the case to proceed based on diversity jurisdiction. (*Id.*). On the other hand, the Estate argues that U.S. Steel and BNSF failed to meet their "heavy burden" of proving fraudulent joinder. (Estate's Mot. to Remand 3, ECF No. 23).

The Court's subject-matter jurisdiction turns on the authenticity of the Estate's FELA claims, so it permitted the parties to conduct limited discovery and submit supplemental briefing. (Mem. & Order 5–6, ECF No. 64). That decision partly relied on a finding that the affidavits attached to the Notice of Removal were inadmissible hearsay. (*Id.*).

U.S. Steel and BNSF then submitted supplemental briefs supported by the deposition testimony of Wayne Gum, who worked at U.S. Steel's Granite City railyard in different capacities over 44 years. (U.S. Steel's Supp. Brief 2, ECF No. 67). BNSF's Supplemental Brief also partly relied on an affidavit by Tom Ondiezek, BNSF's Superintendent of Operations for the St. Louis area. (BNSF's Supp. Brief. 2, ECF No. 65). The Estate moved to strike Ondiezek's affidavit because it was not made subject to cross-examination and was submitted on the eve of the filing deadline. (Estate's Mot. to Strike 5, ECF No. 70).

Finally, the Estate submitted its own Supplemental Brief, arguing that (1) U.S. Steel is a common-carrier railroad because it owns TranStar, a common carrier; and (2) BNSF was the decedent's employer because it had the *right* to control U.S. Steel's activities. (Estate's Supp. Brief 1, ECF No. 68). The Estate also contends that a procedural defect in the Notice of Removal independently requires remand. (*Id.* at 8–10).

## II.     LAW & ANALYSIS

Even disregarding Ondiezek's testimony and resolving all issues of fact and law in the Estate's favor, the Estate cannot establish a cause of action under FELA against U.S. Steel or BNSF. U.S. Steel is not a common carrier just because it owns TranStar—an entity with no real connection to this dispute. BNSF was also not the decedent's employer: Other than requiring U.S. Steel to follow its loading requirements, BNSF could not direct, control, or supervise any U.S. Steel employees. By extension, holding BNSF liable under FELA here could undermine basic assumptions in the contractual relationship and dissuade other railroads from hauling U.S. Steel's goods. Remand is therefore inappropriate.

### A.  Legal Standard

"Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court which the district court of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). But "[d]ue regard for their rightful independence of state governments . . . requires that [federal courts] scrupulously confine their own jurisdiction to the precise limits which the statute has defined." *Healy v. Ratta*, 292 U.S. 263, 270 (1934). Thus, "the statutory procedures for removal are to be strictly construed," *Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 32 (2002), and any doubts should be resolved "in favor of the plaintiff's choice of forum in state court," *Schur v. L.A. Weight Loss Ctr.*, 577 F.3d 752, 758 (7th Cir. 2009).

Allegations of *fraudulent joinder* commonly appear in the context of diversity jurisdiction, when each defendant must be a citizen of a different state than the plaintiff. *See* 28 U.S.C. § 1332. If the plaintiff joins a nondiverse defendant to suit, then federal jurisdiction is destroyed. But if the

claim against that nondiverse defendant is frivolous, then a diverse defendant can assert *fraudulent joinder of parties* and ask the district court to throw out the nondiverse defendant and proceed under diversity jurisdiction.

Fraudulent joinder rarely arises in the context of federal-question jurisdiction. Federal courts have original jurisdiction over all cases and controversies arising under federal law. *Id.* § 1331. That is, unless Congress makes an exception. *See* U.S. Const. art. 3, § 2; *Sheldon v. Sill*, 49 U.S. 441, 446 (1850). This is one of those rare cases: Because Congress prohibited the removal of FELA claims, *see* 28 U.S.C. § 1445(a), U.S. Steel and BNSF contend that the Estate fraudulently joined those claims solely to frustrate federal jurisdiction, (Notice of Removal 4–9).

But the legal standard in the Seventh Circuit is unsettled: How should district courts assess *fraudulent joinder of claims*, and what evidence can they consider? This Court concludes that the standard applied to *fraudulent joinder of claims* is the same as *fraudulent joinder of parties*.

1. *Fraudulent Joinder of Parties*

"[I]n most cases fraudulent joinder involves a claim against an in-state defendant that simply has no chance of success, whatever the plaintiff's motives." *Poulos v. Naas Foods, Inc.*, 959 F.2d 69, 73 (7th Cir. 1992). In other words, the "right of removal cannot be defeated by a fraudulent joinder of a resident defendant having no real connection with the controversy." *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921). "The doctrine is designed to 'strike a reasonable balance among the policies to permit plaintiffs the tactical prerogatives to select the forum and the defendants they wish to sue, but not to reward abusive pleading by plaintiffs, and to protect the defendants' statutory right to remove.'" *Morris v. Nuzzo*, 718 F.3d 660, 666 (7th Cir. 2013) (quoting 14B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3723). That said, the removing defendant has a "heavy burden to establish fraudulent joinder":

> The defendant must show that, after resolving all issues of fact *and law* in favor of the plaintiff, the plaintiff cannot establish a cause of action against the in-state defendant. At the point of decision, the federal court must engage in an act of prediction: is there any reasonable possibility that a state court would rule against the non-diverse defendant?

*Poulos*, 959 F.2d at 73 (emphasis in original).

In the notice of removal, defendants must include "a statement of the facts relied upon, and not otherwise appearing, in order that the court may draw the proper conclusion from all the facts" that there was *fraudulent joinder of parties*. *Chesapeake & Ohio Ry. Co. v. Cockrell*, 232 U.S. 146, 151 (1914). They must prove "that the claim is utterly groundless, and as a groundless claim does not invoke federal jurisdiction, the district judge must dismiss that defendant before ruling on the plaintiff's motion to remand." *Walton v. Bayer Corp.*, 643 F.3d 994, 999 (7th Cir. 2011). "Merely to traverse the allegations upon which the liability of the resident defendant is rested, or to apply the epithet 'fraudulent' to the joinder, will not suffice: the showing must be such as compels the conclusion that the joinder is without right and made in bad faith . . . ." *Chesapeake & Ohio Ry. Co.*, 232 U.S. at 152. "[I]ssues of fact arising upon a petition for removal are to be determined in the Federal court . . . ." *Id.* at 154.

The federal courts are split as to the type of evidence they may consider when confronted with an allegation of *fraudulent joinder of parties*:

> In ruling on a fraudulent joinder question a district court has a procedural choice: it may look only to the contents of the pleadings or the court may choose to look "beyond the pleadings" or to what has been referred to in some judicial opinions as summary-judgment-type evidence, as many district judges chosen to do. This approach permits an examination of materials such as the affidavits and the depositions accompanying either a notice of removal or a motion to remand the actions to state court.

13F Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3641.1. And this Court struck a balance in *Aaron v. SmithKline Beecham Corp.*, No. 09–CV–01071–JPG, 2010 WL 1752546, at *3 (S.D. Ill. Apr. 28, 2010): "[A] court is narrowly confined to the pleadings and must resolve all questions of fact and of law against removal, save in a small class of cases where a plaintiff's inability to establish a cause of action against a diversity-defeating party in state court can be proven incontrovertibly through summary evidence." Other judges in this District have similarly concluded that "a court may in some circumstances 'pierce the pleadings'" and consider "uncontroverted summary evidence which establishes unmistakably that a diversity-defeating defendant cannot possibly be liable . . . ." *Rutherford v. Merck & Co., Inc.*, 428 F. Supp. 2d 842, 847–48 (S.D. Ill. 2006).

### 2. *Fraudulent Joinder of Claims*

Unlike *fraudulent joinder of parties*, assertions of *fraudulent joinder of claims* are few. Because federal courts ordinarily have original jurisdiction over federal claims, they rarely encounter allegations that a federal claim was joined to *defeat* jurisdiction. That said, Congress can make exceptions to federal jurisdiction, as it did here: Claims brought under FELA in state court are not removable. *See* 28 U.S.C. § 1445(a). The situation may arise, therefore, when a plaintiff may "fraudulently join" a frivolous FELA claim to a state-court complaint and frustrate removal.

The sparsity of caselaw addressing how to analyze an assertion of *fraudulent joinder of claims* reflects how seldomly it occurs. The Seventh Circuit addressed it once in *Hammond v. Terminal R.R. Ass'n*, 848 F.2d 95, 96–97 (7th Cir. 1988). There the plaintiff-worker sued the defendant-railroad in state court under FELA, claiming harassment and emotional distress. *Id.* at 96. The railroad removed to federal court, arguing in its notice of removal that the worker's

claim arose under Railway Labor Act ("RLA"), not FELA. *Id.* The district judge agreed, recharacterizing the FELA claim as an RLA claim; denying remand; and dismissing the RLA claim on its merits. *Id.* The Seventh Circuit affirmed, finding remand inappropriate because the worker's FELA claim—"as pleaded in the state court"—was frivolous. *Id.* at 98.

For all that, there is a tension between *Hammond* and the standard this Court has used when evaluating *fraudulent joinder of parties*. True enough, *fraudulent joinder of parties* and *fraudulent joinder of claims* both address whether an "utterly groundless" or "frivolous" claim can be used to defeat federal jurisdiction. But in the context of *fraudulent joinder of parties*, this Court recognized that it can look beyond the pleadings to answer that question—at least in "a small class of cases." In the context of *fraudulent joinder of claims*, however, the Seventh Circuit said to only look at the claim "as pleaded in state court." *Hammond*, 848 F.2d at 98.

After a close reading of *Hammond*, this Court finds that the Seventh Circuit's instruction to only consider the pleadings was dicta. The *Hammond* court never considered whether extrinsic materials could be used to prove *fraudulent joinder of claims*. The decision should not be read so broadly as to bar the Court from considering summary-type materials here. *Fraudulent joinder of claims* and *fraudulent joinder of parties* both involve similar allegations about meritless, jurisdiction-defeating claims. And "federal courts are without power to entertain claims otherwise within their jurisdiction if they are 'so attenuated and unsubstantial as to be absolutely devoid of merit,' 'wholly insubstantial,' 'obviously frivolous,' 'plainly unsubstantial,' or 'no longer open to discussion.' " *Hagans v. Lavine*, 415 U.S. 528, 536–37 (1974). At bottom, the reason for applying different evidentiary standards to these analogous doctrines is not readily apparent. The Court will therefore apply *fraudulent joinder of parties* jurisprudence to *fraudulent joinder of claims*.

### B. Motion to Strike

The Estate asks the Court to strike an affidavit by Tom Ondiezek, BNSF's Superintendent of Operations for the St. Louis area. It contends that Ondiezek's affidavit was not submitted in good faith because it was not made subject to cross-examination and was filed on the eve of the filing deadline.

"The court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous material," either on its own or upon a party's motion. Fed. R. Civ. P. 12(f).

Even if the Estate's contention is true, BNSF concedes that Ondiezek's "affidavit is fully consistent with the testimony of Wayne Gum." (BNSF Resp. to Estate's Mot. to Strike 1, ECF No. 69). Because Ondiezek's affidavit is redundant, the Court will not consider it.

### C. Motion to Remand

Applying the *fraudulent joinder of parties* jurisprudence, it is U.S. Steel and BNSF's burden to prove that the Estate's FELA claims are frivolous. And this Court agrees that there is no reasonable possibility that a state court would rule against U.S. Steel or BNSF on the Estate's FELA claims. Remand is therefore inappropriate.

#### 1. *Procedural Defect at Removal*

The Estate argues that the Notice of Removal was defective because the attached affidavits contained inadmissible hearsay. Based on that defect, it contends that remand is required. The Court disagrees.

"It is true that a 'legally defective' removal petition subjects the case to remand, under 28 U.S.C. § 1447(c), on the ground that the case has been 'improvidently' removed." *N. Ill. Gas Co. v. Airco Indus. Gases*, 676 F.2d 270, 273 (7th Cir. 1982). But even when an initial removal petition is defective, the removing party can cure that defect by amending it, "notwithstanding the

fact that the amendment was filed more than thirty days after [the removing party] received a copy of the state court complaint." *Id.* "The question is whether it was so defective as to be incurable." *Kinney v. Columbia Sav. & Loan Ass'n*, 191 U.S. 78, 80 (1903).

The Notice of Removal here was not defective enough to be incurable. Indeed, the Court held as much when it ordered the parties to conduct limited discovery. The parties then cured any defect in the Notice of Removal by supplying the Court with supplemental briefing. The Court need not remand this case based on a supposed defect in removal.

### 2. *The FELA Claims*

"FELA provides a federal remedy for railroad employees who are injured on the job." *Abernathy v. E. Ill. R.R. Co.*, 940 F.3d 982, 988 (7th Cir. 2019).

> Every **common carrier by railroad** while engaging in commerce between any of the several States or Territories . . . shall be liable in damages to any person suffering injury while he is **employed by such carrier** in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51 (emphasis added). "Thus, there are three basic prerequisites to FELA liability. The defendant must, at the time of the plaintiff's injury, be (1) a common carrier, (2) employing the plaintiff, (3) in furtherance of interstate commerce." *Smith v. Rail Link, Inc.*, 697 F.3d 1304, 1307 (10th Cir. 2012).

### a. U.S. Steel Is Not a Common-Carrier Railroad.

"[T]he words 'common carrier by railroad'. . . mean one who operates a railroad as a means of carrying for the public—that is to say, a railroad company acting as a common carrier." *Wells*

*Fargo & Co. v. Taylor*, 254 U.S. 175, 187 (1920). But "there exist a number of activities and facilities which, while used in conjunction with railroads and closely related to railroading, are yet not railroading itself." *Edwards v. Pac. Fruit Express Co.*, 390 U.S. 538, 540 (1968). "The distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently, and hence is regarded in some respects as a public servant." *Kelly v. Gen. Elec. Co.*, 110 F. Supp. 4, 6 (E.D. Pa.), *aff'd*, 204 F.2d 692 (3d Cir. 1953).

> Whether a carrier is a common or private one is dependent on the nature of its tender. If a carrier seeks to serve a particular class of individuals, it is a private carrier. A carrier which invites the general public is a common carrier.

*Demetrion v. Edwards*, 416 F.2d 958, 959 (7th Cir. 1969).

"Courts have long recognized that in-plant rail facilities are not common carriers, even where those facilities are quite extensive." *Kieronksi v. Wyandotte Terminal R.R. Co.*, 806 F.2d 107, 109 (6th Cir. 1986). This includes "mere plant facilities" and the "internal trackage of large industrial plants." *United States v. La. & Pac. Ry. Co.*, 234 U.S. 1, 23 (1914); *see Strykowski v. N.E. Ill. Reg'l Commuter R.R. Corp.*, No. 93–2724, 1994 WL 287395, at *5–6 (7th Cir. June 28, 1994); *e.g.*, *Duffy v. Armco Steel Corp.*, 225 F. Supp. 737, 738 (W.D. Pa. 1964) (holding that steel company with internal trackage was not a common carrier because it did not offer services to the public); *Schutzenhofer v. Granite City Steel*, 479 N.E.2d 406, 410 (Ill. App. Ct. 1985) ("Granite City Steel does not have the traditional characteristics of a common carrier.").

Judge Clary of the Eastern District of Pennsylvania considered a similar question in *Kelly v. Gen. Elec. Co.*, dismissing a FELA claim against General Electric Company ("GE") because it was not a common carrier. 110 F. Supp at *5–6. At a plant in Philadelphia, GE "engaged in the business of manufacturing, rebuilding, and repairing electrical equipment and other products." *Id.* at *5. The plant contained two miles of internal trackage, two switching engines used to move

railcars around the plant, nine specially constructed railcars that were rented out to rail carriers hired to transport GE's products, and ten other railcars used as storage. *Id.* Judge Clary concluded that "[t]here is no showing that [GE] holds itself out generally to the public as offering services of transportation for hire, nor is there a showing that defendant engages in 'carrying for hire the goods of those who see fit to employ them.'" *Id.* at *7 (quoting *La. & Pac. Ry. Co.*, 234 U.S. at 26). *Kelly* has been positively cited by several Courts of Appeals, including the Seventh Circuit. *E.g.*, *Kieronski*, 806 F.2d at 108; *Strykowski* 1994 WL 287395, at *5–6; *Lone Star Steel Co. v. McGee*, 380 F.2d 640, 643–44 (5th Cir. 1967).

The facts about GE in Philadelphia are analogous to those about U.S. Steel in Granite City. So the Estate contends instead that U.S. Steel is a common-carrier railroad because "*TranStar*, its wholly-owned subsidiary . . . is a common carrier." (Estate's Supp. Brief 1 (emphasis added)). It points to FELA for support:

> The term "common carrier" as used in this chapter shall include the receiver or receivers or other persons or corporations charged with the duty of the management and operation of the business of a common carrier.

45 U.S.C. § 57. In other words, the Estate argues that U.S. Steel is a common carrier because it "had [a] duty to manage and operate TranStar," a common carrier. (Estate's Reply to U.S. Steel's Resp. to Estate's Mot. to Remand 3, ECF No. 63). The Court disagrees.

There is no reasonable possibility that a state court would rule against U.S. Steel because merely owning TranStar does not make U.S. Steel a common carrier. The purpose of § 57 is to prevent railroads from escaping FELA liability by just assigning their railroading operations to subsidiaries. *See N.C.R.R. Co. v. Zachary*, 232 U.S. 248, 257 (1914). And the Estate does not allege that U.S. Steel is hiding its common-carrier status by acting through TranStar; or that the decedent was working for (or with) TranStar at the time of the accident. *Compare Eddings v.*

*Collins Pine Co.*, 140 F. Supp. 622, 628 (N.D. Cal. 1956) ("There is no reason why a non-railroad parent company which completely dominates a railroad subsidiary, not only as to stock ownership, but also as to management and operation, should not be held responsible under the Act for negligent injuries to employees of the parent company while performing the railroad duties of the subsidiary."), *with Smith v. Rail Link, Inc.*, 697 F.3d 1304, 1307 (10th Cir. 2012) ("The underlying company—the true carrier by rail—is the one which is subject to FELA liability, not the company . . . which is called upon for advice and consultation in ensuring that the carrier's workers operate efficiently.").

The evidence suggests that TranStar has no connection to this dispute. It is based in Pittsburgh and has no physical presence in Granite City. (Bojalad Dep. 6:24–7:6). What's more, Wayne Gum, the decedent's supervisor for 15 years, knew little about TranStar besides the fact that it "is owned by U.S. Steel" and its employees attend U.S. Steel's audits. (Gum Dep. 27:4–10). Section 57 of FELA is inapplicable when, as here, the injured party seeks to hold its non-railroad employer liable based merely on the existence of a common-carrier subsidiary.

### b.  BNSF Was Not the Decedent's Employer.

"Liability under FELA is limited in these key respects: Railroads are liable only to their employees, and only for injuries sustained in the course of employment." *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 691 (2011) (affirming this Court). In drafting FELA, "Congress used the words 'employe[r]' and 'employed' in their natural sense, and intended to describe the conventional relation of employer and employe[e]." *Hull v. Phila. & Reading Ry. Co.*, 252 U.S. 475, 479 (1920).

That said, FELA applies not only to "nominal" employers of an injured plaintiff, but also to "common-law" employers:

> Under common-law principles, there are basically three methods by which a plaintiff can establish his 'employment' with a rail carrier for FELA purposes even while he is nominally employed by another. First, the employee could be servicing as the borrowed servant of the railroad at the time of his injury. Second, he could be deemed to be acting for two masters simultaneously. Finally, he could be a subservant of a company that was in turn a servant of the railroad.

*Kelley v. S. Pac. Co.*, 419 U.S. 318, 323–24 (1974) (internal citations omitted). "[T]he question of employment . . . turns on the degree of control the [railroad] company exerts over the physical conduct of the worker in the performance of services," *Schmidt v. Burlington N. & Santa Fe. Ry.*, 605 F.3d 686, 689 (9th Cir. 2010) (citing *Kelley*, 419 U.S. at 324). "[I]mmediate control and supervision is critical in determining for whom the servants are performing services." *Shenker v. Balt. & Ohio R.R.*, 374 U.S. 1, 6 (1963). The Court must therefore "carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking." *Standard Oil Co. v. Anderson*, 212 U.S. 215, 222 (1909).

The Estate argues that FELA liability falls on BNSF because it provided the railcar that the decedent fell from; was responsible for safety inspections and repair; "generally controlled the work of the employees by requiring U.S. Steel to follow its rules"; and "had the right to control how its rail cars were used by U.S. Steel." (Estate's Supp. Brief 12, ECF No. 49). The Court disagrees.

The Estate relies mainly on *Kottmeyer v. Consol. Rail Corp.*, 424 N.E.2d 345, 347–48 (Ill. App. Ct. 1981). There the plaintiff-worker was employed by Pennsylvania Truck Lines, Inc. ("PTL"), a wholly owned subsidiary of Consolidated Rail Corporation ("Conrail"). PTL was tasked with loading, unloading, and transporting Conrail's railcars. *Id.* When the worker was injured while performing these services, he argued that Conrail was also his "employer" under

FELA. The Illinois court agreed, noting that (1) PTL was Conrail's subsidiary; (2) Conrail owned the worksite and provided the equipment; (3) Conrail's supervisors monitored PTL employees, ensured that they worked fast enough, and provided instructions; (4) Conrail set PTL employees' work schedules; and (5) "on at least one occasion Conrail, without the necessity of obtaining specific authority so to do, exercised control over the conduct of PTL employees engaged in street work off the premises as well." *Id.* at 352.

True enough, the *Kottmeyer* court noted that "[t]he relevant inquiry extends not only to control the employee's actions but to the *right to control* those actions as well." *Id.* at 353 (emphasis added). The court's conclusion, however, had nothing to do with Conrail's right to control: Conrail directed PTL employees in most aspects of their work, providing the equipment, the worksite, and the supervision. In other words, Conrail *actually controlled* the PST's employees.

*Kottmeyer* is distinguishable from this case. BNSF provided a transportation service for U.S. Steel. (Bojalad Dep. 13:6). Other than the railcars used to haul U.S. Steel's goods, BNSF provided no equipment or training; and the railcars were loaded and unloaded by U.S. Steel employees at U.S. Steel facilities. (Gum Dep. 18:16–19:20). There were no BNSF employees—supervisors or otherwise—present at U.S. Steel facilities; nor "[d]id BNSF Railway have any input or control on how Mr. Dagon did his job." (*Id.* at 18:15–19). All in all, BNSF did not actually control *any* of the decedent's work.

The Estate also argues that BNSF had a right to control the decedent's work because U.S. Steel agreed to follow BNSF's Rules Book. When it contracted with BNSF to haul its goods, U.S. Steel agreed that it would have to load BNSF's railcars. (BNSF's 6100-B Rules Book 22, ECF No. 49-4). U.S. Steel also agreed to follow BNSF's loading requirements, which incorporates the Association of American Railroads' Loading Rules. (*Id.*). The Estate therefore contends that

— 16 —

BNSF's Rules Book reveals its right to control U.S. Steel's employees. (Estate's Supp. Brief 11). The Court disagrees.

The Rules Book is precisely the kind of cooperation required under U.S. Steel and BNSF's agreement. BNSF relied on U.S. Steel to properly load its railcars so it could safely transport them. And besides the loading rules, nothing in the record reveals that BNSF could direct, control, or supervise any U.S. Steel employee. Taken as a whole, there is no reasonable possibility that a state court would rule against BNSF on the Estate's FELA claim.

### III.   CONCLUSION

The Court:

- **GRANTS** the Estate's Motion to Strike;

- **DENIES** the Estate's Motion to Remand;

- **DISMISSES** Counts One and Four of the Complaint;

- **FINDS AS MOOT** U.S. Steel's Motion to Dismiss Count Four; and

- **FINDS AS MOOT** BNSF's Motion for Summary Judgment on Count One.

**IT IS SO ORDERED.**

**Dated: Tuesday, July 21, 2020**

                                                                                            **S/J. Phil Gilbert**
                                                                                            **J. PHIL GILBERT**
                                                                                            **UNITED STATES DISTRICT JUDGE**